**Civil Rights Division - Bureau of Labor and Industries**

# NOTICE OF SUBSTANTIAL EVIDENCE DETERMINATION

Complainant: Micaela Herrera

Respondent: Teen Challenge International Pacific Northwest Centers *DBA* Pacific Northwest Adult & Teen Challenge

Case Number: EEEMSM160623-10888

Investigator: Zachary Zerzan

Filing Date: June 23, 2016

Reviewed By:

## I. Jurisdiction

Oregon Revised Statutes chapters 659A, ORS 25.337, 25.424, 171.120, 345.240, 441.184, 476.576, 651.060, 651.120, 652.355, 653.060 and 654.062, and Oregon Administrative Rules chapter 839 divisions 2, 3, 5, 6, 9 and 10 authorize the Civil Rights Division to accept, investigate, amend, resolve and determine complaints alleging unlawful practices in employment, housing, places of public accommodation, state government and career, professional and trade schools.

Specific facts supporting a conclusion that the Division has jurisdiction over respondent(s) are found below.

## II. Allegations

On June 23, 2016, Complainant filed a complaint with the Civil Rights Division. Complainant alleges the following violation(s):

1. Complainant alleges Respondent subjected her to discrimination on the basis of sex. ORS 659A.030.

2. Complainant alleges Respondent subjected her to discrimination on the basis of marital status. ORS 659A.030.

## III. Identity of Respondent(s)

1. Respondent Teen Challenge International Pacific Northwest Centers Dba Pacific Northwest Adult & Teen Challenge is a Domestic Non-Profit and is a person pursuant to ORS 659A.001(9).

## IV. Findings of Fact

1. Respondent Teen Challenge International Pacific Northwest Centers Dba Pacific Northwest Adult & Teen Challenge employs one or more persons in the state of Oregon and is an employer pursuant to ORS 659A.001(4)(a).

2. At all times material to this complaint, Respondent employed 1 or more individuals and is a covered employer under ORS 659A.030.

3. In answer to this Complaint, Respondent provided a position statement making the following assertions:

    a. "[Respondent] is a 501(c)(3) religious organization that provides faith based recovery services. The mission of [Respondent] is to evangelize people who have life-controlling problems and initiate the discipleship process to the point where a student can function as a Christian in society, applying spiritually motivated, biblical principles to relationships in the family, local church, chosen vocation, and the community."

    b. "[Complainant] was employed by [Respondent] to act as an instructor, trainer, mentor and supervisor of students in the religious program."

    c. "As part of her employment, [Complainant] filled out an employment application and signed a [*sic*] "Applicant's Statement." That statement provides in relevant part:

        > I recognize that if I am hired as an employee of [Respondent], I will be seeking to help this ministry fulgill [*sic*] their stated mission of 'Evangilizing [*sic*] people who have life-controlling problems.' I agree to uphold the Constitution and ByLaws and Policies of [Respondent]. I further recognize and support their goal of 'Initiating the discipleship process to the point where students can function as Christians in society and apply spiritually motivated Biblical principles to relationships in their family, local church, cosen [*sic*] vocation and community.' . . . I recognize my personal conduct can have a great affect [*sic*] on the students who observe my behavior. I shall therefore endeavor to maintain the highest moral standards set forth in Scripture to encourage the students of [Respondent]. I will, to the best of my ability, abstain from activities and substances that can cause these students to stumble in their faith in Christ."

    d. "[Complainant] was terminated because her life choices and personal conduct departed from those contained in scripture."

4. In addition to its recovery services ministry, Respondent operates business operations that, according to Vice President of Business Operations, Rodger Snodgrass, provide 50 percent of Respondent's funding. Respondent's largest business operation is comprised of a network of thrift stores where Respondent resells donated goods.

5. Respondent hired Complainant to perform part-time work in Respondent's Albany resale and donation center on or around October 16, 2015.

6. Sometime shortly after she began working for Respondent, Complainant was promoted to Assistant Manager of the Albany resale and donation center.

7. Complainant received an evaluation of her performance as Assistant Manager on December 21, 2015. Complainant's overall performance was rated "Exceptional." Of 16 total categories, Complainant received a rating of "Exceptional" in 8 and "Very Good" in 8.

8. In December 2015, Complainant became pregnant.

9. Complainant was not married.

10. According to Complainant, she reported she was pregnant to Warehouse Manager Russ Johnson at the end of January 2016, when she missed work in connection with an event that she believed at the time might have been a miscarriage.

11. At interview with BOLI, Johnson could not recall specifically when Complainant revealed she might be pregnant, but he knew it was around the time he and Complainant traveled to Bend to reset the store there. Email records indicate Complainant and Johnson traveled to Bend sometime between February 6, 2016, and February 11, 2016.

12. At interview with BOLI, Complainant recalled telling Johnson that she would not know if she had a miscarriage until she saw her doctor again the following week.

13. At interview with BOLI, Johnson was unable to recall the specific conversation, but agreed that he told Complainant something along the lines of "let's wait and see" or that he "needed to know more to figure out what to do." Johnson further recalled urging Complainant to report her pregnancy to Area Manager Kevin Van Dyke.

14. Johnson did not report Complainant's pregnancy to Kevin Van Dyke at that time.

15. At interview with BOLI, Complainant recalled that she had no further discussions about her pregnancy with anyone at work until March 21, 2016, when Johnson called her into his office and asked whether she was pregnant. According to Complainant, after this conversation Johnson called Van Dyke and reported to him that Complainant was pregnant.

16. Johnson was unable to recall the specific conversation in which Complainant confirmed that she was pregnant but agreed that, after he received that confirmation, he called Van Dyke. Johnson was unable to recall whether he made that call alone or with Complainant in the room.

17. At interview with BOLI, Van Dyke recalled reporting Complainant's pregnancy to Snodgrass immediately after receiving Johnson's report.

18. At interview with BOLI, Van Dyke recalled meeting that same day with Respondent's Executive Leadership Team, which was comprised of Snodgrass and Vice President of Ministry Operations, Dave Oliver. According to Van Dyke, Oliver and Snodgrass asked for his assessment of the situation, to which he stated that he believed Complainant had violated Respondent's Code of Conduct and Employee Manual. Van Dyke explained to BOLI that it was the act of premarital intercourse that violated Respondent's Code of Conduct.

19. At interview with BOLI, Van Dyke recalled meeting with Oliver and Snodgrass later that week, at which time he was directed by the Executive Leadership Team to terminate Complainant's employment.

20. At interview with BOLI, Snodgrass recalled instructing Van Dyke to terminate Complainant for "moral failure," in light of her "pregnancy out of wedlock."

21. At interview with BOLI, Snodgrass indicated that he had been involved with many terminations, including many involving, "moral failure," but this was the first termination that involved an unmarried female employee who was pregnant.

22. At interview with BOLI, Snodgrass indicated that he had never terminated a male employee for impregnating a female, but indicated that if he were to come across that situation then he would terminate the male employee.

23. On March 26, 2016, Complainant received a document entitled Teen Challenge International Pacific Northwest Centers Payroll Status Change, stating that she had been terminated for "Violation of Company Policy and Standards."

## V. Summary

Complainant alleges Respondent subjected her to discrimination on the bases of sex and marital status when it terminated her after discovering that she had become pregnant while she was not married. ORS 659A.030.

*Discrimination on the Basis of Sex*

To show discrimination on the basis of sex, Complainant must present substantial evidence showing (1) she is a member of a protected class; (2) Respondent took some adverse employment action against her; and (3) there is a causal nexus between Complainant's protected class and the adverse employment action.

In this case it is undisputed that Complainant is a woman and that Respondent terminated her. Also undisputed in this case is that Complainant was terminated in connection with Respondent's discovery that she was pregnant. Respondent has produced evidence indicating Complainant, like all of Respondent's employees, had signed an agreement that she would follow Respondent's Code of Conduct. Respondent maintains that Complainant was terminated for violating Respondent's code of conduct by having premarital sexual intercourse.

Respondent does not dispute that the sole basis for discovering Complainant's conduct violation was Complainant's disclosure that she was pregnant. OAR 839-005-0010 provides that substantial evidence of adverse impact discrimination exists if a respondent (1) has a standard or policy that is applied equally; (2) the standard or policy has the effect of screening out or otherwise affecting members of a protected class at a significantly higher rate that others who are not members of that protected class; and (3) the aggrieved person is a member of the protected class adversely affected by the Respondent's standard or policy and has been harmed by the Respondent's application of the standard or policy.

In this case, Respondent has a policy that proscribes premarital intercourse and applies to all of its employees. However, because only women can become pregnant, Respondent's use of Complainant's pregnancy as the sole basis for concluding she had engaged in premarital sexual intercourse is evidence that Respondent is engaged in a practice that exposes female employees to a significantly greater degree of risk of termination for engaging in premarital sexual intercourse than male employees.

The record shows that when Complainant initially reported she might be pregnant to Johnson, he told her to wait and see. It wasn't until Complainant confirmed that she was pregnant that Johnson reported to Van Dyke. Accordingly, the record indicates that it was Complainant's pregnancy that precipitated Johnson's report, not his discovery of the proscribed act. Because men can't get pregnant, Respondent's discovery of Complainant's violation was the result of a condition that is directly related to

Complainant's sex and Respondent's decision to terminate Complainant for "moral failure" was causally connected to Complainant's protected class.

When it terminated Complainant for engaging in premarital intercourse Respondent also subjected Complainant to discriminatory terms and conditions of employment on the basis of sex. Respondent admits that it has never fired a male employee for impregnating a female. In this case the only evidence that Respondent used to establish that Complainant had engaged in premarital sexual intercourse was her pregnancy, a condition that is exclusive to women.

*Marital Status*

ORS 659A.030 proscribes discrimination on the basis of marital status. The record contains evidence that Respondent has a policy against employees engaging in premarital sexual intercourse. Because Respondent's policy provides for different treatment of employees on the basis of marital status, Respondent's policy is discriminatory on its face. It is undisputed that Complainant was unmarried at the time she became pregnant and was terminated. Under Respondent's policy, if Complainant had been married then she would not have been terminated for "moral failure." Accordingly, Complainant's marital status was a motivating factor in her termination. Respondent has not advanced a legitimate non-discriminatory reason for its decision to terminate Complainant.

## VI. Determination(s)

The Bureau of Labor and Industries, Civil Rights Division, finds SUBSTANTIAL EVIDENCE OF AN UNLAWFUL EMPLOYMENT PRACTICE (discriminatory terms and conditions, adverse impact discrimination) on the basis of sex, in violation of ORS 659A.030.

The Bureau of Labor and Industries, Civil Rights Division, finds SUBSTANTIAL EVIDENCE OF AN UNLAWFUL EMPLOYMENT PRACTICE (termination) on the basis of marital status, in violation of ORS 659A.030.

Zachary Zerzan
Senior Investigator
Civil Rights Division

Amy Klare
Administrator
Civil Rights Division